LUIS ANTONIO GONZÁLEZ ET AL., Plaintiffs and Appellees, *v.* MARYLAND CASUALTY COMPANY ET AL., Defendants and Appellants.

No. R-67-276.     Decided February 3, 1970.

*Rivera Zayas, Rivera Cestero & Rúa* and *Rodolfo Cruz Contreras* for appellants. *B. Hernández Vargas* for appellees.

PER CURIAM: The trial court concluded that as a result of the collision which occurred on May 17, 1963, between the taxi property of appellant González Detrés and the vehicle driven by appellee Luis Antonio González, when the former swerved and entered the lane where said appellee had stopped on Ponce de León Avenue, near Stop 36 in Río Piedras, González suffered a nervous breakdown which aggravated an emotional and nervous condition marked by anxiety, agitation, tremor, and sudoresis.

In its judgment, the trial court ordered appellants to pay for damages,

| | |
|---|---|
| to Luis Antonio González | $15,000 |
| to his wife Haydee Albertorio González | 1,000 |
| to his mother Crucita Meléndez | 500 |

We issued the requested writ for the sole purpose of reviewing the conclusion of the trial court to the effect that the accident in question aggravated the existing emotional and nervous condition of the above-mentioned appellee. We have reached the conclusion that the trial court erred.

For the purpose of deciding whether this conclusion is justified it is necessary to summarize the evidence presented with regard to González' mental condition before and after the accident.

In the Veterans Administration there is an extensive case history of the above-mentioned appellee which was presented in evidence. It shows that:

(1) Since his childhood, when he was kicked by a horse, González suffers from a severe psychoneurosis marked by nervousness, anxiety, apprehension, tremors, feigned hysteria, and fits of an epileptic character. He was interned in the Clínica Juliá for several days in 1946. For the purpose of leaving the hospital, against the doctors' advice, Dr. Maymí issued a report of the examination he practiced on him which says: "For the last thirteen months the patient has been

suffering from a severe chronic state of anxiety, which had a sudden access after he had an automobile accident. He suffered an acute panic reaction; this has been the basis of his present anxiety neurosis. He has not improved." In 1952 a psychiatrist social worker, after interviewing him reported that "The patient is shy, he limits himself to answer the worker's questions. He seems tense, he keeps rubbing his hands, and at one moment he seemed on the verge of tears. He was very depressed. Apparently his industrial and social adjustment is very limited . . . he has no plans of getting a payed job."

(2) Dr. José Jiménez, as a result of the psychiatric examination he practiced on appellee on July 24, 1954, reports that "he alleges that he is ashamed of giving the impression of being a healthy and robust individual capable of performing strong work, when actually he depends completely on his father for his support and that of his family." Thereinafter this report states that "The diagnosis of conversion reaction is favored because when the patient is completely inactive his behavior is almost normal but he gets panicky and assumes a bizarre conduct when he faces undesirable situations or when he has to work for his support."

(3) His wife, in a letter of December 20, 1955 informs that "because of the physical condition of my husband he is practically disabled to perform any kind of work . . . this situation of not being able to get employment has brought upon him certain mental preoccupation which, in my opinion, has made his nervous condition worse turning him into a tyrant in such a manner that our lives run some risk."

(4) The clinical social worker, Alfonso Rivera, in his record of October 22, 1959, states that González appears withdrawn within himself, without spontaneity, tremulous, and incapable of giving relevant facts or remembering past events. He shows a total indifference towards his environment. He has the tendency of staying alone and when he is

disturbed he becomes irritated and starts to shake and sometimes he loses consciousness. He does not stand arguments against his ideas and when he meets opposition he turns aggressive.

(5) On May 21, 1963, four days after the accident, González and his wife appeared before the Veterans Administration for the purpose of having his pension increased. In 1947 he had been granted a 10% disability. It was increased to 30% in 1959, and to 70% on October 7, 1963. The increase was based on his disability to work due to the condition described in Dr. Mattei's report whose observations as to González' psychiatric condition did not vary from those previous to 1959, except for the fact that he states that the patient does not work.

(6) Six months after the accident, González submitted a statement of his net income and employment where he stated that *he was totally disabled in November 1962;* that the largest amount which he had earned was $1,000 in one year working with his father and that he had not worked again since the time he became disabled; that he had to quit his last employment because his nervous condition was aggravated to the point that he could not help his father anymore. During all these steps, taken for the purpose of increasing González' pension, no reference was made to the accident which gave rise to this litigation.

The psychiatrist, Dr. Ramón Alonso Santiago, testified on the condition of appellee González whom he examined for about two hours on two occasions two years after the accident. His diagnosis was "conversion" and "acute anxiety reaction." He testified that he understood that the condition after the accident was more serious than before "judging from what the patient told me." He testified that the accident prevented appellee from working "right after the accident." When he was faced with the different reports of the doctors

and of the social workers specialized in psychiatry, he admitted that the description of appellee's condition which arises from such reports is in accord with the state of conversion and severe anxiety. He testified that the diagnosis made by Dr. Maymí in 1946 is the same the witness made in 1967. He testified that he agrees with Dr. Jiménez' statement (foregoing par. 2). Questioned on whether appellee's conduct of lying when he was answering the form for admission and employment in the Veterans Administration is compatible with the state of anxiety, he answered: ". . . I would say that there is an intimate and direct relation, which is understandable."

As to the accident, appellee testified that:

". . . when I was going along the center lane of Ponce de León Avenue, I saw at some distance a taxi which comes zigzagging; then I told my wife to take precautions because she is holding a two-month baby in her arms—take precautions because this man is probably going to turn that way. I saw him at some distance. I was able to determine. I told her: a moment, wait. I stopped my car, put my hand out, I make my signals, and he came facing me and he hit my car . . . I saw that taxi coming, I applied the brakes, and facing me he hits me here . . . I alighted from my car; then my mother was wounded, my wife had been recently operated on, four months before she was operated on for gallbladder, and two months before she underwent a cesarian operation. When the collision came, I heard my wife utter some moans, and she was very nervous. The heels of the shoes incrusted in the rug of my car; that these men disengaged the shoes; assisted her and took her to the hospital. I stayed in the car. The cars were hooked; my car with the radiator broken, the police had to move them to a nearby lot . . . . My main damage is this thing I have, which you can witness . . . . My car, I come along this side; my car remains so, and this taxi comes, runs out this way and comes, face to face, staying hooked under mine . . . . By the front bumper, hooked. . . . That we had to bring it down by means of jacks and with the weight of persons so we could unhook it."

In regard to the damages sustained as a result of the accident appellee testified that on the date of the accident he was a traveling salesman for Antonio A. Durán, Inc. selling electrical appliances and toys, all year round. He worked with this firm for five years on commission. He testified that "Some with others I get [the commission] not less than $500 monthly." Questioned if after the accident he kept working for Antonio Durán, he answered:

"Right after that I tried and I was for about two months in the employment; then this condition went on affecting me and then they themselves recommended me to see a doctor; to take a rest. No matter how much I wanted to return I could not stay in the employment.

".        .        .        .        .        .        .        .

"I have a family to support; I had to work; I could not lie around. I kept working. My boss told me: 'I suggest you see a doctor.' I tried to keep on working. He said: 'you cannot keep on working.' That has been the reason for everything.

".        .        .        .        .        .        .        .

"My sales dropped. I went to see a client and I remember a day when I could not write his bill, he had to do it for me. One day I got to a point when they gave me some pills, I fell asleep when driving along that Cayey road."

The evidence presented of the liquidations of the commissions paid to appellee for his work as salesman shows that he received a monthly average during

    1959   of   $283.00
    1960   of     112.55
    1961   of     199.66
    1962   of     263.11
    1963   of     166.63

In May 1963 the only evidence adduced was the payment of a commission of $15.94 during one week of said month (which coincides with Dr. Alonso's testimony that appellee was disabled for work "right after the accident"), but it

does not appear whether that was the totality of the payments during said month or whether on other weeks of May 1963 he made sales for which additional commissions were credited to him. During June 1963 he received $104.21 in commissions, $91.31 during July, $142.46 during August, and $203.85 during September. For the last week reported concerning his commercial activity which was in September 1963, he received a payment of $172.34 which is one of the highest payments for a workweek received by appellee by way of said commissions.

On the cross-examination with respect to such income and his total disability, appellee admitted that he lied when he submitted the information which appears in the statement of his income and employment to which we referred in paragraph 6 above. Questioned on whether he had notified the Veterans Administration about the accident, he answered "I did not report it because there are white lies. If you are going to shelter under a good shade you are not going to say that. I leaned against a good tree. I had the right it was just for me to receive compensation. If I had not done so look what would have happened to me . . . perhaps if I had told them that, there, they might not even have given me the pension." Thereinafter the cross-examination goes as follows:

"Q. Did you lie to get the pension?

"A. Certainly, to get the pension. I have filled out those papers.

"Q. According to what was more convenient to get the pension?

"A. Certainly yes."

Appellee also lied when he denied having "that" nervousness in the army and of having tremors or of having told anyone that he shaked while he was in the army.

We believe that the circumstances of this case are distinguishable from those of *Concepción Guzmán* v. *Water Resources Auth.*, 92 P.R.R. 473 (1965). In this last case it

dealt with a person "having a hysteric, neurotic personality." We concluded that there was a causal relationship between the accident (explosion accompanied by sparks in the house which occurred when a high-tension electric lighting post broke, causing the wires to cross each other producing a thunderous explosion) and the psychic condition which began to develop right after, until the onset of a state of hysterical conversion or conversion reaction, conclusion which was corroborated by the testimony of three well-known physicians who took care and treated appellant extensively for a long period of time. Appellee's neuropsychiatrist who examined him for two hours was the only one who concluded that "there is no relationship between the symptoms appellant presented when I examined him and the occurrence." In *Concepción Guzmán, supra,* appellant lost consciousness almost immediately after the explosion. He recovered consciousness in the hospital and since then he showed clear and unequivocal symptoms of his conversion reaction. There was no evidence in this case to show that the patient suffered from a conversion reaction before the explosion.

In the case at bar, when the accident occurred, appellee did not lose control of himself. He was concerned with having his wife, his daughter, and his mother taken care of, and of having his vehicle moved to an empty lot. He remembered a great many details of the accident and of its results. He did not suffer any bodily injury. The conversion reaction condition existed in appellee for many years. Nevertheless he was able to work and after the accident he continued working for several months more. His conduct of lying to obtain a higher pension from the Veterans Administration, and in the witness stand concerning his mental state while he was in the army, shows a purpose of obtaining a higher pension, in addition also to a higher compensation by means of the proceeding concerning his claim through this litigation.

We believe that the evidence of appellee's mental state which issues from his record in the Veterans Administration clearly established that appellee suffered for many years of a conversion reaction. In view of this evidence, and taking into consideration appellee's conduct described above, the testimony of the psychiatrist who examined him at his request twice for two hours each time, two years after the accident, and who testified that judging from what appellee told him, appellee's mental condition was more serious than before the accident in question, is of little value.

In view of the foregoing, the judgment in this case should be modified for the purpose of reducing the amount of the damages granted to appellee to the sum of $1,000. Thus modified it should be affirmed.

Mr. Chief Justice did not participate herein. Mr. Justice Santana Becerra is of opinion that a compensation of $4,000 should be granted to appellee.